Thank you, Your Honor. Would you please the court, Leslie Weatherhead of Spokane for the appellant, Riverstone Companies. The judgment of the district court, Your Honors, should be reversed for four reasons. This was a relatively straightforward case involving the standards of Rule 56 and contract law, and the judge who decided it against my client committed four distinct errors. First, the trial court failed to credit a reasonable alternative interpretation of the contract tendered by Riverstone Companies. Second, the trial court credited the extrinsic evidence brought by Barnes & Noble and excluded, actually struck, the contrary extrinsic evidence brought by Riverstone Companies. Third, the trial court, in its interpretation of the contract, substituted language that the parties didn't use for language that they had used, leading it to a result favorable to Barnes & Noble. And fourth, the trial court failed to tender for a decision by the trier of fact to jury a question of relative measurement that, at least in this circuit, the courts have said, is inherently a question that can't be decided on summary judgment. On the question of whether Riverstone had a reasonable interpretation to bring to the court in support of its point of view about the meaning of the contract, I think Riverstone, and would respectfully represent to the court, that Riverstone has the better of the argument, certainly as to a grammatical interpretation of the agreement. And we spent some time in our briefs working through the rules of grammar. Right, right. Well, I guess, you know, I guess from the standpoint, if you're to prevail, it has to be ambiguous. Yes, Your Honor. And so you didn't write a very good contract. And then, or there wasn't a very good contract here. The record says that the draft, the initial draft, came from Barnes & Noble in a form, and then there were modifications made to that. So I would put it that Barnes & Noble didn't write a very good contract. And I agree with that, Your Honor. Well, but you're all a party to it. And essentially, you know, sort of the backdrop seems that the economy went sour and that Barnes & Noble looked at the contract and thought, Aha, you know, there aren't very good numbers here, and this is, you know, this, you know, there's an interpretation here that says we can terminate, and we do. And, you know, on the other side, you're trying to say that even if it's ambiguous, you're trying to say that, well, the economy went sour, and then, but I'm going to blame it all on Barnes & Noble. If Barnes & Noble hadn't pulled out, then everything wouldn't have collapsed. So Barnes & Noble is responsible for everything that happened, right? That is the position, Your Honor, although presumably at a later trial on damages, there would be questions about the impact of the overall economy on this project, without a doubt. But I think it is undisputed, at least as the case comes to the court, that the initial failure of the project, because of the co-tenancy clauses that not only Barnes & Noble has, but all these other tenants have, that the lease-up went, I think the record says, from 85% to 50-some percent, because other tenants left when they heard that Barnes & Noble wasn't coming. And, yes. Well, I guess sort of the irony of this is to prevail here, you have to say it's ambiguous. And then if you prevail, you're going to go down there, and then you're going to argue that, no, it's clear that this is what it meant, and that's why Barnes & Noble's wrong, right? I, Your Honor, actually, there was a time during the course of drafting the brief in this appeal that I was really tempted to say to the court, you ought to reverse, because grammatical principles direct that my client has the better of the argument, and you ought to send it back with directions to enter judgment on the meaning of the contract in favor of my client. I was really tempted to make that argument, and I couldn't come up with a good answer to Judge Windmill's opinion in the Axis case, which we've cited in here, in which he says, there isn't any rule that says that people have to use good grammar. And so that's where that sort of tipped me over to the view, don't even try that, don't even ask the court for that. But the fact of the matter is that the application of the rules of grammar, if we are going to read this agreement to the exclusion of all the contextual evidence around it, the application of the rules of grammar says, I have a reasonable interpretation of who is an inducement tenant to bring to the court. Okay, let me ask you, basically, we have to look at the whole contract. I have to say that when I read it, I thought the only logical conclusion was inducement tenants meant all of those, okay? So maybe I have bad grammar, and so I'm going back to examine my grammar in light of the briefs, all right? But I had one other question, is if you read the whole contract and you look at paragraph 4.3, it refers back to the requirements related to the inducement tenants that are talked about in 18.1. And the only way you can get requirements in the plural, it seems to me, out of 4.3, is to look at 18.1 as being the inducement tenants being each one of those categories. So in trying to look at the whole thing together, that was one thing that kind of stopped me from saying it's ambiguous. So I'd appreciate your comment on 4.3F. Sure, Your Honor. First of all, a fill up to the grammatical rules again. The absence of a comma tells you that the phrase, the requirements of 18.1 relative to inducement tenants, means that the requirements relative to inducement tenants are not the only requirements in that paragraph. The absence of a comma on a grammatical principle tells you that that is one of a series of sets of requirements of 18.1. But to address the real point of your question, the use of the plural in requirements, what the landlord has to do is the landlord has to issue a written certification demonstrating that it has leases with tenants that are not subject to termination except on stated conditions and that it has either, that they have either opened for business or are operating, excuse me, that they are either open and operating or have reached a certain stage of construction. So there's the plural of the requirements relative to inducement tenants.  I don't know, I guess that seems to be a requirement. You have to do one or the other. But then you're saying, but there's other requirements within 4.3F. Within 18.1. Oh, excuse me, with 18.1. Yes, Your Honor. And the other requirements under 18.1 are? Well, the ones that are not relative to inducement tenants are those that are relative to the cinema and those that are relative to the inducement restaurants, which is the second category of the three categories of tenants that are required under the co-tenancy clause. I think, if I may, that structurally. Wait a second. Sorry. So just, you tie this back to the specialty retailers. Yes, Your Honor. But the question is, why doesn't it tie back to all three of those, the requirements reference? The answer is it's ambiguous, and it might. If I could stand here and tell you, as I said a moment ago, if we were going to rigorously apply the rules of grammar, the rules of grammar would say that that clause refers to its immediate antecedent. And so, therefore, I would say inducement tenants can only be those listed specialty retailers. But if we're going to acknowledge, as I must, that people can write ungrammatical contracts, then it's ambiguous. Well, so if you read inducement tenants to include only the specialty retail tenants, would that mean that Barnes & Noble could not back out of the lease if Regal Cinema and all four restaurants went out of business, but they could back out if one specialty tenant closed, leaving 49,000 square feet of lease space? How does all that make sense? Recall that 18.1 gives certain remedies to Barnes & Noble, and 18.2 gives certain related remedies. So that if all three of the co-tenancy clauses are not met, then under 18.1 the Barnes & Noble has certain options to delay tenancy and maybe get some rental offsets and things like that. No, I thought if any one of those wasn't. I beg your pardon. That's correct. Okay. But my point was that 4.5 is special. It's singular. It is related specifically to the inducement tenants, whoever they are. And the first question you might ask yourself is, structurally, why would you have a separate 4.3F and 4.5? 4.5 is the we can terminate if clause, and 4.3F is one of the conditions that 4.5 operates on. So the first question I ask is, structurally, why would you have a 4.3F and 4.5 distinct from 18.1? If you weren't meaning to lift some subset of the co-tenancies out of 18.1 into a special termination clause. Because 18.1 says if you don't get the cinema, or you don't get these four restaurants, or you don't get the 50,000 square feet of specialty retailers, then we can delay opening and we can get a rental offset or whatever it might be under 18.1. 4.5 and 4.3F says if you don't do whatever it is that that's required in 4.3F as to inducement tenants, we can terminate on the spot as of November 15th. I got that under that. I thought there was November 15th, 2008, so it added. It's not co-terminus. It adds another term, or it adds another kind of drop dead date, if you will. Right. This all has to do with delivery. Correct. So you can have these options. Maybe you decide you want to delay at this point because, you know, both sides maybe have mutual interest in going forward. But then you also decide at a certain point, you know, I don't actually want to delay anymore. It's November 15th, 2008. I just want this thing. I'm out of here. But, you know, at the outset you might not have made that decision. You might have just decided you'd go with 18.1. So it doesn't seem to me that 4.5 and 4.3 are superfluous. But my question is structurally. If the interpretation tendered by Barnes & Noble is correct, why, number one, wouldn't you start 18.1 with the phrase saying you shall have inducement tenants as follows? And why wouldn't you add what's 4.3F to the end of 18.1? There may be other ways of structuring it. Let me just ask you this question because you're an experienced lawyer. Do you really want an opinion from this court that any contract in which there is a grammatical, literal grammatical interpretation is different than the meaning of the contract as proffered by one side? That then it's ambiguous? I don't think so. But I do think. Why isn't that what you're arguing? What I'm saying, Your Honor, is that I have an interpretation of this contract that's surrounded. It is supported by the intentions of the parties as they were expressed at the time. It's supported by the intrinsic evidence. It makes good sense. It's nonpunitive. And so it happens to be a fair reading of the agreement as written. So the significance of the grammatical principles at issue here is they support my view tendered to the court that our reading of the agreement as to the meaning of inducement tenants is a fair reading. And there are endless precedents saying that where there are two fair readings of a contract, a trier of fact decides which is correct. Okay. Do you want to reserve some time? I will reserve the two remaining minutes. Thank you, Your Honors. Good morning, Your Honors. Pleased to court counsel Matthew Anderson on behalf of Barnes & Noble. Your Honor, we're here on an appeal of a de novo appeal of the interpretation of a contract by Judge Shea. Well, you're sort of jumping right to it. And that the antecedent rule has been cited by both the Supreme Court and the Ninth Circuit for the proposition that the limiting clause or phrase should ordinarily be read as modifying only the noun or phrase that immediately follows. Why shouldn't that apply here or why isn't that a reasonable reading at least? Your Honor, to answer your question, can I ask you to pick up the excerpts of excerpts that I handed up? I have that, Your Honor, and turn to the first page, which is 18.1. Got it. You'll see in the lower right-hand corner of these pages I've cited to where the document came from, from the excerpt of records. Answering your question specifically, Your Honor, the antecedent rule does apply in this situation because inducement attendance refers to the preceding phrase. The preceding phrase of this conditionally structured sentence that is a paragraph in length begins, In the event any one of, and any one of are Roman numbers 1, 2, and 3. The antecedent is any one of those three events. Any one of those three events. To have placed a comma anyplace in there would have destroyed the structure of the sentence, and not only that, would have destroyed the conditional nature of the paragraph. If you read the sentence beginning in 18.1, In the event any one of, beginning 1, 2, and 3, skipping to the word inducement attendance, is not either. That is the condition of this particular obligation. Well, you, when you're supporting your position of how it should be read, you put in some extrinsic evidence. Why, if it's unambiguous, why did the court go there? Your Honor, that is a red herring and not correct. There is no extrinsic evidence offered to the court nor relied upon by Judge Shea, nor am I asking you to rely on any extrinsic evidence to find that this clause is not ambiguous. I believe what they're pointing to. Again, extrinsic evidence are those matters that occurred as a precursor to a prior. Wasn't there an Exhibit A? Who proffered that? Your Honor, that is, I did. And Exhibit A is the next page. And that is not an extrinsic piece of evidence. That merely is a document that, a piece of evidence that demonstrates the performance of the contract. The law of Idaho, which is the controlling law in this case, is very clear that the court may look at the party's course of performance to determine what interpretation the parties applied to the contract. The photograph is what Riverstone posited as its performance of 18.1. If you look at the photograph, you'll see that the Barnes & Noble building is very obvious. And if you see in the right-hand corner, Pad 37, there's absolutely nothing on it. So if I go back to 18.1, and the best way I can help the court here is to demonstrate to you what I told Judge Shea. Is that the first obligation was to have a theater. It's there, not in dispute. The second obligation was to have a restaurant on Pad 37. Turn the page. There's no restaurant on Pad 37. Well, if the restaurant on Pad 37 was on target to open the same day as Barnes & Noble, why didn't that satisfy the comparable state of construction clause in the lease? Your Honor, because that, again, is a red herring argument. The very purpose of these clauses are to make sure that everybody opens at the same time. The obligation on Riverstone was to keep the progress of the project going forward. So Barnes & Noble or any of the other tenants who have correspondingly similar co-tenants. Well, I guess if we have to give all these explanations, why isn't that ambiguous? Your Honor, I don't believe that is ambiguous. When I look at comparable state of construction and everyone's got to tell me what it means. Oh, no. I'm not. I'm telling you it's a defined term. Well, I don't know what it means. If I, if you may, Your Honor, if you read that clause, the shopping, excuse me, has not proceeded to a state of construction comparable to the completed shell of the premises. If you bear with me a second on this, Judge. And if you can turn with me in this page, I guess it's the, if you go to the contract itself, which is in the package about midway. What number does it have on the? Lower right hand. One of your little books. Oh, am I the only one who's got one? No, you. I'll share. Sorry. I handed up. Yeah. Thank you. I apologize, Your Honor. So what's the page on the bottom right of yours? It's in volume three, page 18 of the excerpt of records. It's the page that has lease agreement on the top. Thank you, Your Honor. Your Honor, you will see that first page of the lease defines what the premises is. So there's no dispute in what a comparable premises would be. That is something that is leased or built on the project. If you turn the page with me, and why this becomes important, very important is the lease shall commence, and I think Judge Schroeder referred to it earlier as a delivery term. The term of this lease shall commence on the date of landlord's delivery and tenant's acceptance of the premises. Premises is a defined term because it's capitalized, as provided in Article IV. In other words, the tenant has to accept under the conditions of Article IV. If you turn the page, rent begins being paid 135 days later. If you now go to the next page, which is going to answer your question precisely, Judge Callahan, there is a definition of shall. Landlord shall, at its sole risk and expense and in compliance with blah, blah, blah, blah, construct the completed shell of the premises. Shell, a defined term. Paragraph goes on to say it's got to be built, the shell has got to be built consistent with the Exhibit D. Just for a second, if you could turn the page. There's an Exhibit D attached to the lease. The lease is 182 pages long. Exhibit D is 28 pages long. But Exhibit D in detail spells out all those things the landlord has to do to construct a shell to deliver a lease premises. Judges, you don't have to go outside the lease at all to find those definitions and those understandings. The only thing that 18.1 asks landlord to do is have them open or operating, option one. Option two, if not open and operating, we will accept if the state of construction is comparable to what Barnes & Noble has. What Judge Shea ruled and which I urge this Court to do is say there's a building. You don't even have to look inside the building. You don't have to go to extrinsic evidence. There's a building there for Barnes & Noble premises. There's nothing on Pad 37. And that's exactly what Judge Shea ruled and said was dispositive. The second basis that we move for summary judgment was on the inducement tenants themselves. There is the same problem. That's why this argument all becomes a red herring. There is the exact same problem for Riverstone on the specialty tenants because they likewise were not at a comparable state of construction. I'm not saying this because my client takes that position. I'm saying that because Riverstone provided a certification to that effect that stated what the state of construction was. So this is one of those interesting cases. There really is no materially disputed facts with regard to what has to be ruled upon. The only question for the Court will become is whether or not there is an ambiguous provision in 18.1. Respectfully, the question that's asked, why do you have a paragraph 4.3F? I think I can answer that for you. If you permit me to have you turn the page to 4.3, I'm saying turn the page from Exhibit D. Oh, and I went past it. Sorry. Everybody with me? Thank you, Your Honor. 4.3, I have just excerpted three provisions. 4.3 is A to K. This is the laundry list of things that the landlord had to do as a precondition to delivery. That's all it is. So the landlord shall deliver the premises and tenants shall accept. A through K. The three that are applicable to this case are A, C, and F. The F provision, and this is ‑‑ I think you're correctly reading it, Your Honors. First of all, this is a plural provision. It says the requirements. Next thing, it says of paragraph 18.1. It doesn't say 18.1, numerate 3. It says 18.1. Below, relative to inducement tenants, acceptance of the premises, the defined term, have. This is a helping verb that agrees both in number and tense with requirements. If it had been a requirement has of 18.3, that's what it would say. But it says requirements of have. It's a plural reading of the obligation of 18.1. We've already talked about it. The next page has paragraph 4.5 on it. And it says if any of the conditions of the delivery of 4.3 have not been satisfied, not just 4.3F, but 4.3 have not been satisfied, then Barnes & Noble had the right to terminate. So the A to K. The choice for termination, and the termination letter I've stuck in here. It's two pages back from where we are. The actual termination letter says we're terminating because you don't have a restaurant on pad 37, because you don't have sufficient construction on specialty retailers, and you don't have sufficient quality of retailers. If we were arguing about the quality of retailers, we might have an issue of fact. But there's no dispute as to the status of construction of the retail spaces. Again, Judge Shea determined that it was not necessary to rule on the special retail question because 37 was so clear. And that is the nub of that argument. I don't know if I've answered your question, Judge Galliano, but tell me if I've not. No, I think you've responded.  Thank you very much, Your Honor. The court will note in the briefing there were three additional issues that we've raised contextually. The first is that there are three appellants. The only party that has a contract in this case is Riverstone Center West. Our position is that Riverstone Center and Riverstone Center East have not perfected an appeal. The judge independently dismissed them. They have not challenged that by briefing. In addition, there is a citation of some extensive nature in the briefing of Riverstone of excerpts of record excuse me, of portions of the record that Judge Shea struck. And that's relied upon. There has been no appeal of the order striking those portions of the declarations. Because it's a de novo review, I think they're trying to argue they can consider it. But I still believe under the rules they were required to appeal that order striking, which was not done. But more fundamentally for your ruling, you should not be relying on that evidence because it takes you outside the four corners of the lease. And the final, of course, is attorney's fees. I don't believe there's any dispute between the parties that the contract and the law of Idaho provides for that. Unless the court has any questions on those three particular areas, I would rely on my submission to briefing. Are there any other questions that the court has? No, so I'm here to be in. Thank you. Thank you for the challenging grammar lesson here. I feel like we should have the editors of the Chicago Style Manual here with us. I said we should have the editors of the Chicago Manual of Style here with us. Well, I think Mr. Weatherhead has correctly stated that the courts do not rely on the nicely used Thank you, Your Honor. There was a suggestion made in the response that in Idaho, extrinsic evidence is of two characters, one kind that arises before the formation of a contract and one that arises in the course of performance. And I will say we saw that suggestion. We saw the suggestion. We scoured Idaho law and we could not find a case in Idaho that says that that is the case. Extrinsic evidence is extrinsic evidence. And I think that the very way in which the lower court approached this problem is demonstrative that you cannot decide the ambiguities in this contract without resort to the intentions of the parties as exhibited in the extrinsic evidence. His mistake was to strike all the extrinsic evidence offered by Riverstone and credit solely that offered by Barnes & Noble. The second ambiguity relates to what Exactly, let me just, exactly where do you want us to go for your, which extrinsic evidence, where do you want us to go to find that so that we can make sure that we As to, it's cited extensively in our brief, but the point is, Your Honor, that as to inducement tenants, the evidence at the time of the formation of the agreement was that Barnes & Noble was going to occupy I was just asking for a site to be accessed. They're sort of sprinkled throughout the brief, but the most important stuff is the stuff that tells you that Barnes & Noble's principal concerns were let's get everybody open at the same time and the construction that we've offered relates to that. And number two, let's not have Barnes & Noble open at the end of Main Street with building A on its left and building, excuse me, building B on its left and building C on its right when those were under construction and a war zone. It wanted all that done. The restaurant on pad 37 is off to the north. So that's the extrinsic evidence that I think bears most specifically on inducement tenants, Your Honor. And as to the comparison, we're not comparing buildings. You can't. The Hapa Grill was a single-story stick build, slab on grade. Building A in which Barnes & Noble would go was it had a below-ground parking structure. It had condominiums on upper floors above. It was an extremely complicated building, and there isn't any way that you can pick up a brick from one and a brick from the other and do the comparison. It is a relative comparison, and you'll note in the extrinsic materials that Mr. Anderson offered today that Barnes & Noble in its termination letter said you haven't reached the status of completion with the Hapa Grill that you have with the other parts. Well, they had. The undisputed evidence from the experts was that that grill was going to be completed before the Barnes & Noble space was, unless there are further questions for me. There don't appear to be any. Thank you. Thank you for the argument. Thank you both for the arguments. The case just argued is submitted for decision. That concludes the court's calendar for this morning, and the court stands adjourned. All rise.
judges: Schroeder, McKeown, Callahan